IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MERCY TAYO BABATUNDE, | ) |
| Petitioner, | ) ) ) |
| vs. | ) Case No. 09 C 2600 |
| JANET NAPOLITANO, Secretary of Homeland Security; ERIC HOLDER, Attorney General Of the United States; and RUTH DOROCHOFF, District Director, Chicago District Office of Citizenship and Immigration Services, | ) ) ) ) ) ) ) |
| Respondents. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Mercy Babatunde ("Babatunde") has petitioned the Court pursuant to 8 U.S.C. § 1421(c) to review the denial of her application for naturalization. The Court conducted a bench trial. This constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

### Facts

**1. Babatunde's entry into the US and her relationship with Olufemi Babatunde**

Babatunde was born in Nigeria. She first entered the United States in 1989 on a visitor's visa. She remained in the United States after her visa expired.

In 1991, Babatunde met Olufemi Sunday Babatunde ("Olufemi"). In 1992, while living in the United States, Babatunde gave birth to Michael Babatunde ("Michael"), the first of three children she had with Olufemi. Babatunde lived with Olufemi when

Michael was born, and she continued to live with him until sometime in 1993.

Babatunde left the United States for a brief period in August 1993 and re-entered the country later that month. She admitted at trial that she re-entered the United States using someone else's passport. In May 1994, while in the United States, Babatunde gave birth to Samuel Babatunde ("Samuel"), her second child with Olufemi.

## 2. Babatunde's marriage to Reginald Banks

Babatunde married Reginald Banks ("Banks"), a U.S. citizen, in May 1995. The government contends the marriage was a sham that Babatunde entered into in order to obtain immigration benefits.

Banks and Babatunde each testified that they loved each other when they got married. Babatunde denied that she married Banks to get a green card or other immigration benefits, and Banks likewise testified that their marriage was legitimate. Banks testified that they had joint bank accounts and bills, and documentation confirming this was admitted in evidence.

Babatunde and Banks lived together for about three years. Banks was in and out of jail during this period. Babatunde testified that it was difficult for her when Banks was in jail and that at some point, she resumed a relationship with Olufemi. She had a third child with him, Emmanuel, in 1997.

During 1997, Banks lived with his mother for a period of time while recovering after he was the victim of a shooting. When he moved back in with Babatunde, she was pregnant. Unsurprisingly, the fact that Babatunde had a child with another man disrupted her marriage with Banks. Banks testified that he lost trust in her. He moved out for the last time in December 1998. They later obtained a divorce.

### 3. Babatunde's 1995 application for adjustment of status

In June 1995, one month after Babatunde married Banks, he filed a petition for alien relative (Form I-130) on her behalf, asking the immigration authorities to adjust her status to legal permanent resident. Babatunde filed a corresponding I-485 application requesting adjustment of status.

In her I-485 application, Babatunde truthfully disclosed that she had entered the country using someone else's passport. Together with her application, Babatunde submitted a form called a "Supplement A," which she understood to be the form she had to submit because she had entered the country using someone else's passport.

In the space on the I-485 application that required Babatunde to list her spouse and all of her children, she listed only Banks and made no mention of her two children. When asked at trial why she had not listed her children, Babatunde testified that she did not think she needed to list them because they were already U.S. citizens, having been born in this country.

An immigration officer named Timothy Esbrook interviewed Babatunde and Banks in connection with their applications in July 1998. Esbrook, who is currently an asylum officer, handled adjustment applications for only six months in 1998. He did not recall his interview of Babatunde and Banks and testified based on his regular practice and notations he had made on the applications.

Esbrook stated that he would typically adjudicate an I-130 application at the same time as an I-485 application if they were submitted (as in this case) as part of a package and that he would typically interview both the applicant and the applicant's spouse.

Babatunde testified credibly that she disclosed during the interview, as she had on the application itself, that she had entered the country on someone else's passport. Her application reflects that she paid an extra fee and submitted a "Supplement A" stating that she had entered the U.S. without inspection. Esbrook stated that he would have considered an applicant's entry into the United States on someone else's passport as an entry "without inspection," and he testified that this would not bar the applicant from obtaining permanent resident status.

Esbrook stated that when conducting an interview, he would go through the application with the applicant. Using a red pen, he would check off the questions he asked and make any necessary corrections to the application.

Esbrook testified that he always asked an applicant about family members. Specifically, on an application like Babatunde's, he would ask whether she was still married to the person who had filed the I-130 and whether they were still living together. He would also ask whether the applicant had children and had ever had children. If an applicant had children with someone other than her spouse, he would inquire further about the relationship with the other person to assess whether it affected the validity of the applicant's marriage. On cross-examination, Esbrook conceded that having a child out of wedlock would not be a bar to adjustment of status.

On Babatunde's application, Esbrook had drawn a red line through the empty spaces below where the application directs the applicant to identify her children. Esbrook said this indicated that the applicant told him she had no children.

Banks testified that he recalled going to an interview with an immigration official regarding the application he had filed, but he did not recall the official asking any

questions about whether Babatunde had children. Babatunde testified that during the interview, the official did not ask about her children.

Esbrook concluded that Babatunde met the requirements for adjustment of status. The Immigration and Naturalization Service, as it was then known, approved the I-130 and I-485 applications on July 31, 1998.

**4.     Babatunde's first application for naturalization**

In January 2000, Babatunde and Olufemi signed documents for a mortgage loan on a home at 18 East 140th Court in Riverdale, Illinois. The documents identify Olufemi S. Babatunde as the mortgagor and states he is married to Mercy Opanuga-Babatunde. Babatunde testified that she signed the documents without reading them and that she did not know the documents stated that she and Olufemi were married.

In late 2001, Babatunde filed an application for naturalization (Form N-400). On the portion of the application asking if the applicant has any children, she filled in "0" and did not list any of her children. Babatunde testified that when she was interviewed on the application, she was not asked if she had children.

On the application form, Babatunde checked the box stating that she was eligible for naturalization because she had been a permanent resident for three years and had been married to and living with a U.S. citizen during that time. Babatunde stated on the form that Banks lived at 18 East 140th Court in Riverdale, Illinois – the house that Babatunde and Olufemi had purchased in 2000. Babatunde admitted at trial that Banks had never lived at that location and that, in fact, she lived there with Olufemi starting in late 2000. She testified that she put on the application that Banks lived there because she did not know where he lived.

5

INS officer Nancy Krumpolz interviewed Babatunde on her application on March 14, 2002. Krumpolz testified that she conducted all her naturalization interviews in the same way. She would first put the applicant under oath and then administer the civics test and the English writing / reading test. Krumpolz testified that her practice was to then go through the application with the applicant. She stated that she although would not review each and every question on the application, she did ask certain questions in every interview, concerning the applicant's name and address, travel outside the U.S., marital status, children, criminal record, voting record, and membership in terrorist groups. She would use a red pen during the interview and would check off items that she verified with the applicant.

As indicated above, Babatunde's 2001 application for naturalization stated that she was qualified to be a U.S. citizen because she was married to and had been living with a U.S. citizen for three years and had legal permanent resident status during that time. Krumpolz said that for this reason, she would have asked Babatunde if she and Banks were still married and where Banks lived at the time of the interview and for evidence, such as bank records or tax returns, that they were still married and living together. (In fact, Babatunde had not been living with Banks for over a year at the time of the interview.)

On Babatunde's application, there was a red checkmark next to the box where Babatunde listed that she had no children. Krumpolz testified that this indicated she had verified the answer with Babatunde during the interview. Krumpolz said that had she known an applicant was not living with her listed spouse, it might have been grounds to deny the application, and she would have asked where the spouse was

6

living and why they were separated.  She stated, however, that the fact that an applicant had children outside the marriage would not necessarily bar approval of the application.

Krumpolz testified that she asked Babatunde for additional information and that because she did not provide it, her application was later denied.  Krumpolz could not recall what additional information she requested.

**5.     Babatunde's second application for naturalization**

In 2005, Babatunde submitted another application for naturalization.  This time, she selected as her basis for eligibility the fact that she had been a legal permanent resident for at least five years.  In the application, Banks again left blank the section regarding children.

The evidence showed that Babatunde was interviewed three times regarding the 2005 application, by two different immigration officers.  The first interview took place in August 2005.  Immigration officer Keisha Harris-Wright claimed to recall her interview of Babatunde, testifying via deposition that Babatunde was a memorable applicant because she was confident, very nice, and very talkative.

Harris-Wright said it was not unusual for an applicant to leave blank the box asking how many children the applicant has.  She stated that some applicants only list children who are age eighteen or younger.  She also said applicants sometimes, but rarely, do not count children who are already U.S. citizens.

Harris-Wright wrote on Babatunde's application form, using red ink, that Babatunde had one child, Michael Babatunde, who was born in Nigeria in 1997 and was actually Babatunde's nephew.  When asked to explain this, Harris-Wright testified

7

that she asked Babatunde if she had any children and that Babatunde told her about Michael, identifying him as her sister's son. Harris-Wright testified that Babatunde said she was helping her sister by supporting Michael financially. At trial, Babatunde denied giving this information about Michael to Harris-Wright. To support her point, Babatunde noted that the year and place of Michael Babatunde's birth is stated incorrectly on the application where Harris-Wright said she wrote this information.

Harris-Wright also testified that she asked Babatunde how she had entered the United States and where the passport she used was. Babatunde told her she had lost it. Harris-Wright also administered English and U.S. government and history examinations, which Babatunde passed. It appears that in May 2006, Babatunde had a second meeting with Harris-Wright, who gave Babatunde thirty days to produce additional evidence in support of her application.

The Court notes that on her N-400 form, Babatunde answered "no" to the questions, "Have you EVER lied to any U.S. government official to gain entry or admission into the United States?" and "Have you EVER given false or misleading information to any U.S. government official while applying for any immigration benefit . . .?" There was no question on the form, however, asking whether the applicant had ever entered or tried to enter the U.S. illegally.

In June 2007, USCIS official Justyna Oliwa also interviewed Babatunde regarding her application. Oliwa had no real recollection of the interview at the time of her testimony. Oliwa said that her practice was to go through the application page by page with the applicant to verify the information and that she would ask the applicant what she characterized as "the most important questions" – those concerning the

8

applicant's name, address, marital history, employment, and children.  She said that because of her accent, she often has to repeat questions to applicants.

Oliwa stated that she would make a light checkmark on the application to denote answers she had verified with the applicant.  She noted that she had put a checkmark on Babatunde's application next to the blank regarding children.  She said this indicated she had asked Babatunde whether she had any children.  Oliwa testified that if Babatunde had said she had three children, Oliwa would have asked follow-up questions to determine why she had not listed them on the application.

Babatunde testified that Oliwa did not ask her about children.  Babatunde also testified that she did not read the instructions for the form explaining how to fill out the section regarding children.

## 6. The denial of Babatunde's application

USCIS denied Babatunde's application on May 16, 2008.  USCIS concluded that Babatunde had not lawfully been admitted to permanent residency because she had obtained her permanent resident status by fraud.  The decision cited Babatunde's use of another person's passport to enter the United States in 1993 and her misrepresentations regarding whether she had children.

After receiving the denial, Babatunde appealed and requested a hearing.  In conjunction with the appeal, Babatunde submitted a revised N-400 form on which changed her answers to "Yes" on the questions asking whether she had ever given false or misleading information to a U.S. government official while applying for an immigration benefit and whether she had ever lied to a U.S. government official to gain entry or admission to the United States.  Babatunde testified that she changed those

9

answers on the advice of her attorney.

On June 18, 2009, USCIS denied her appeal. The decision cited Babatunde's admission that she committed fraud to enter the United States by using someone else's passport and the fact that she misrepresented information about whether she had children. The decision also found that Babatunde had misrepresented the year of her birth and her maiden name. USCIS concluded that Babatunde had been erroneously granted lawful permanent resident status.

## Discussion

A person whose application for naturalization is denied can seek review of the denial in federal court. 8 U.S.C. § 1421(c). The court reviews the application *de novo* and makes its own findings of fact and conclusions of law. *Id*.

To qualify for naturalization, an immigrant must show that she has:

- resided continuously in the United States for at least five years immediately prior to applying for naturalization "after being lawfully admitted for permanent residence" (plus certain specific residency requirements not pertinent here);
- resided continuously within the United States from the date of the application up to the time of admission to citizenship; and
- during all of these periods "has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States."

8 U.S.C. § 1427(a)(1)-(3).  *See also* 8 C.F.R. § 316.2.  The government argues that Babatunde has not the requirements of lawful admission for permanent residence or good moral character.

The applicant for citizenship bears the burden of proving her eligibility.  *INS v. Pangilinan*, 486 U.S. 875, 886 (1988) .  The weight of authority is that the applicant must prove her eligibility by a preponderance of the evidence.  *See Nyari v. Napolitano*, 562 F.3d 916, 919 (8th Cir. 2009); *United States v. Hovsepian*, 359 F.3d 1144, 1168 (9th Cir. 2004).  *See also* 8 C.F.R. § 316.2(b).  At least one court of appeals has held that the applicant must establish her eligibility by clear and convincing evidence.  *See, Dicicco v. INS*, 873 F.2d 910, 915 (6th Cir. 1989).

Whatever the burden, Babatunde has not met it with respect to the requirement of good moral character.  The Court deals first, however, with the government's contention that Babatunde has failed to show that she was lawfully admitted for permanent residence.

**1.      Lawful admission to permanent residence**

The government argues that Babatunde has failed to prove that she was lawfully admitted to permanent residence, because she fraudulently entered the U.S. using another person's passport and because she applied for adjustment of status based on a sham marriage.  *See* Govt.'s Proposed Conclusions of Law ¶¶ 15-16.

**a.      Entry into the U.S. using another person's passport**

The government argues that Babatunde was never eligible to become a legal permanent resident because she entered the country using another person's passport.

It relies on 8 U.S.C. § 1182(a)(6)(C)(ii)(I), which states that "[a]ny alien who falsely represents, or has falsely represented, himself or herself to be a citizen of the United States for any purpose or benefit under this chapter (including section 1324a of this title) or any other Federal or State law is inadmissible."

Though this provision facially appears to apply, Babatunde unambiguously disclosed on her application for permanent residence (as did Banks on his simultaneous petition for alien relative) that she had entered the country using someone else's passport. She also filed a waiver form and paid an additional fee under section 245(i) of Immigration and Nationality Act. That provision, 8 U.S.C. § 1255(i), authorizes permanent residency status for an alien who entered without inspection, upon application and payment of a fee. Immigration officer Esbrook, who approved Babatunde's application with full knowledge that she had entered on another person's passport, testified that this sort of entry was appropriately treated as an entry without inspection and was subject to waiver.

The government points to cases in other circuits in which courts allowed reevaluation of decisions made earlier in the immigration process after new information came to light. *See, e.g., Arellano-Garcia v. Gonzales*, 429 F.3d 1183, 1184, 1187 (8th Cir. 2005) (immigration officials mistakenly approved application for permanent residency because they did not realize applicant had a prior conviction). But in Babatunde's case, the immigration authorities had the pertinent information – it was patently apparent from Babatunde's and Banks' applications – and they granted Babatunde a waiver. The evidence does not permit the Court to conclude that this was an error. The Court declines to rule that Babatunde was ineligible for permanent

12

resident status on this basis.

### b. Sham marriage issue

The government also contends that Babatunde obtained her permanent resident status based on what it characterizes as her "sham marriage" to Banks. The evidence does not reflect, however, that Babatunde's marriage to Banks was a sham.

An application for permanent resident status will not be approved if "the alien has attempted to enter into a marriage for the purpose of evading the immigration laws." 8 U.S.C. § 1154(c)(2). As the statutory language indicates, the focus is on the alien's intent; it does not require that her spouse be a part of the sham. *See United States v. Tagalicud*, 84 F.3d 1180, 1185 (9th Cir. 1996).

"A marriage that is entered into for the primary purpose of circumventing the immigration laws, referred to as a fraudulent or sham marriage, has not been recognized as enabling an alien spouse to obtain immigration benefits." *Brown v. Napolitano*, 391 Fed. Appx. 346, 351 (5th Cir. 2010) (internal quotation marks and citation omitted). The focus is on whether the couple intended to establish a life together at the time they were married. *Surganova v. Holder*, 612 F.3d 901, 904 (7th Cir. 2010). *Cf. Lutwak v. United States*, 344 U.S. 604, 611 (1953) ("The common understanding of a marriage, which Congress must have had in mind when it made provision for 'alien spouses' in the Ward Brides Act, is that the two parties have undertaken to establish a life together and assume certain duties and obligations.").

The fact that the alien spouse hopes to obtain an immigration benefit, such as permanent resident status, does not make a marriage a sham. "Just as marriages for

money, hardly a novelty, . . . may be genuine and not sham marriages, so may marriages for green cards be genuine. An intent to obtain something other than or in addition to love and companionship from that life does not make a marriage a sham." *United States v. Orellana-Blanco*, 294 F.3d 1143, 1151 (9th Cir. 2002). Evidence establishing intent can include, among other things, listing the spouse as a beneficiary on an insurance policy, property leases, income tax forms, and bank accounts. *Brown*, 391 Fed. Appx. at 351.

Though Babatunde's marriage to Banks fell apart relatively quickly and ended badly, the Court is persuaded that it was not a sham. The Court found credible both Banks and Babatunde's testimony that they got married because they loved each other and not simply or primarily to permit Babatunde to obtain permanent resident status. The evidence shows that Babatunde and Banks had a joint checking account and joint bills, they were beneficiaries on each other's insurance policies, and they filed at least one joint income tax return. Babatunde may have been unfaithful to Banks, but that sort of conduct, though unfortunate, does not suggest (at least in the present circumstances) that she entered into a marriage that was a sham from the outset.

**2.    Good moral character**

An applicant cannot be considered to have good moral character if, during the time period for which her moral character must be established, she "has given false testimony for the purpose of obtaining" immigration or naturalization benefits. 8 U.S.C. § 1101(f)(6). Section 1101(f)(6) "does not distinguish between material and immaterial misrepresentations. Literally read, it denominates a person to be of bad moral character on account of having given false testimony if he has told even the most

immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits. . . . [I]t means precisely what it says." *Kungys v. United States*, 485 U.S. 759, 779-80 (1988).

Under section 1427(a)(3), an applicant must continue to meet the good moral character requirement throughout the application process, including the period from her examination by immigration officials through the time she takes the oath of allegiance. *See also* 8 C.F.R. § 316.10(a)(1).

Babatunde has been dishonest, and knowingly so, about her children from the beginning of her dealings with the immigration authorities through the trial in this case. The Court bases this determination on the undisputed facts of record, Babatunde's demeanor while testifying, and her strained explanations for her conduct.

First, Babatunde consistently failed to identify her children on immigration forms that clearly and unambiguously required her to so. Second, she lied on repeated occasions when immigration officials asked her whether she had children. The Court found credible the immigration officers' testimony – supported by, among other things, their contemporaneous notations on the pertinent forms – that they asked Babatunde whether she had children and that she said no. The Court found incredible Babatunde's denials that she was asked about this at her interviews with the immigration officers. Third, the Court finds that Babatunde gave false testimony at the trial when she tried to explain why an immigration officer had written in Michael Babatunde's name on her second N-400 application. Her claim that the officer had somehow managed to pull out of thin air the correct name of one of Babatunde's children was a patent fabrication (even if, as she notes, the year and place of his birth

15

was misstated).

To believe Babatunde's claims regarding why she did not list her children, the Court would have to believe that none of the immigration officers asked her whether she had any children. There is no reasonable or credible basis in the record to support such a determination.

Babatunde's counsel argues that the Court should accept her explanations of the omission of her children from the applications because she would have had nothing to gain by omitting them. The short answer to this is that the Court is not required to ascribe a motive to Babatunde for making false statements. But if one is required, it is easy enough to find: it is likely that Babatunde believed that if she disclosed she had children with one man while married to another, the authorities might have questioned the validity of her marriage and, as a result, might not have granted her application for permanent residence. Thereafter, having made her initial false representations, Babatunde was required to perpetuate them in later applications to avoid discovery.

In addition, Babatunde knowingly lied on her first application for naturalization when she listed Banks' residence as the place where she was living at the time, even though Banks did not live there and never had. This was unquestionably a material misrepresentation, because her application was based on the proposition that she had been married to, and living together with, a U.S. citizen for the three years preceding her application.

Because the evidence shows that Babatunde lied on several forms she filed to obtain immigration benefits and in multiple interviews with immigration officers, and that she lied in her testimony at the trial in this case, the Court concludes that she has failed

to show that she meets the requirement of good moral character necessary for citizenship.[1]

## Conclusion

For the reasons stated above, the Court finds that petitioner has failed to prove that she is eligible for citizenship. The Court therefore directs the Clerk to enter judgment in favor of the respondents and against the plaintiff.

                                                                        MATTHEW F. KENNELLY
                                                                         United States District Judge

Date: January 31, 2011

---

[1] Assuming materiality is required, Babatunde's misrepresentations were material. As Esbrook credibly testified, had Babatunde told him she had children, he would have investigated further regarding the validity of her marriage.